UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| VICTOR LEE DANIELS, | Case No. 18-cv-07326-LB |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF No. 18 & 19 |

## INTRODUCTION

Plaintiff Victor Lee Daniels seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title II of the Social Security Act.[1] The plaintiff moved for summary judgment,[2] and the Commissioner opposed and filed a cross-motion for summary judgment.[3]

Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties have consented to magistrate-judge jurisdiction.[4]

---

[1] Compl. – ECF No. 1. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 18.

[3] Cross-Mot. – ECF No. 19.

[4] Consent Forms – ECF Nos. 12, 13.

ORDER – No. 18-cv-07326-LB

The court denies the plaintiff's motion, grants the Commissioner's motion, and affirms the ALJ's decision

## STATEMENT

### 1. Procedural History

On September 10, 2012, Mr. Daniels, then age 41, filed an application for social-security disability insurance benefits under Title II of the Social Security Act, alleging "neck [pain] with left arm radiculopathy."[5] He alleged an onset date of April 14, 2008.[6] He last met the insured-status requirements of the Social Security Act on December 31, 2010.[7] The Commissioner initially denied his claim on December 27, 2012,[8] and again on reconsideration on April 26, 2013.[9] On May 10, 2013, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[10] On February 25, 2014, the ALJ held a hearing and heard testimony from the plaintiff (represented by Dr. Dan McCaskell, a non-attorney representative) and a vocational expert ("VE").[11] The ALJ issued an unfavorable decision on May 1, 2014.[12]

The Appeals Council granted the plaintiff's request for review.[13] On March 11, 2016, the Appeals Council remanded the case to the ALJ for failure to adequately consider the medical evidence on the record.[14] On April 25, 2017, the ALJ conducted a hearing on remand and heard testimony from the plaintiff, Dr. McCaskell, and another VE, Harlem Stock.[15] The ALJ issued an

---

[5] AR 123. Administrative Record ("AR") citations refer to the page number in the bottom right hand corner of the Administrative Record.

[6] *Id.*

[7] *Id.*

[8] AR 132.

[9] AR 181.

[10] AR 187.

[11] AR 73–122.

[12] AR 147.

[13] AR 236–37.

[14] AR 166–71.

[15] AR 36–72.

unfavorable decision on August 31, 2017.[16] On October 4, 2018, the Appeals Council denied the plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.[17]

Mr. Daniels timely filed this action on December 4, 2018 and moved for summary judgment.[18] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[19]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Evidence

The plaintiff originally alleged that he was disabled as a result of "neck [pain] with left arm radiculopathy."[20] At the administrative hearing, he also presented medical evidence of limited range of motion with his right arm due to a prior injury, obesity, and type II diabetes.[21] The following records were submitted: records from Kent E. Yinger, M.D., who treated the plaintiff for a shoulder injury after he fell approximately 12 feet from the back of a dump truck and landed on his right side;[22] records from John Canova, M.D., who was the plaintiff's primary-care physician from 2007 to 2013, and treated him for back pain, diabetes, and coughs and other ailments unrelated to the disability claim;[23] records from Hari Lakshmanan, M.D., a physiatrist at the Kaiser Occupational Facility who assessed the plaintiff for residual-functional capacity and provided physical therapy;[24] documents from the Santa Rosa Imaging Center regarding the plaintiff's cervical-spine MRI;[25] records from Alan Hunstock, M.D., who evaluated the plaintiff

[16] AR 14–30.

[17] AR 1–8.

[18] Mot. – ECF 18.

[19] Cross-Mot. – ECF 19.

[20] AR 123, 153.

[21] AR 394–405.

[22] AR 627–52.

[23] AR 507–36.

[24] AR 406–94.

[25] AR 565–66.

for an occupational injury to his cervical-spine;[26] James P. O'Hara, M.D., an orthopedic surgeon who evaluated the plaintiff and provided a Medical Source Statement;[27] records from Kevin Satow, M.D., who performed the plaintiff's electrodiagnostic evaluation;[28] records from Sharon Amon, M.D., who reviewed the plaintiff's medical records and completed a Disability Determination Explanation ("DDE");[29] records from H. Jone, M.D., who reviewed the plaintiff's medical records and completed a DDE;[30] and records from Warren B. Chin, M.D., who completed the plaintiff's cervical-spine Residual Functional Capacity ("RFC") questionnaire.[31]

Because the plaintiff's appeal involves his challenge to the ALJ's assessment of treating physician Warren B. Chin, M.D.'s opinion, this order recounts that opinion fully.

On December 6, 2013, Dr. Chin completed a cervical-spine RFC questionnaire.[32] He diagnosed the plaintiff with cervicalgia, cervical degenerative disc disease, and left carpal-tunnel syndrome.[33] The plaintiff had constant, chronic pain.[34] The "signs, findings, and associated symptoms" of his impairment were tenderness, muscle spasm, impaired sleep, motor loss, dropping things, and reduced grip strength.[35] The plaintiff had significant limitation of motion;[36] Dr. Chin said that he could move his neck for less than one hour per day in any direction. Dr. Chin noted that an "MRI of [the cervical] spine [showed] C5–6 disc herniation," and "electrodiagnostic studies [were positive] for [left] carpal tunnel" syndrome.[37] The plaintiff experienced drowsiness

---

[26] AR 567–70.

[27] AR 394–405.

[28] AR 571–74.

[29] AR 24, 123–33.

[30] AR 24, 135–45.

[31] AR 551–555.

[32] Id.

[33] AR 551.

[34] Id.

[35] Id.

[36] Id.

[37] AR 552.

as a side effect of amitriptyline (chronic nerve pain) and Robaxin (muscle spasms).[38] Dr. Chin indicated that the plaintiff's impairments had lasted (or could be expected to last) at least twelve months, and that he was not "a malingerer."[39]

The plaintiff's pain and other symptoms were frequently severe enough to interfere with his attention and concentration needed to perform simple work tasks.[40] He was able to tolerate moderate stress.[41] He could both sit and stand for more than two hours at one time, and for at least six hours in an eight-hour day.[42] He required an unscheduled break approximately once a day for fifteen minutes to stretch his neck and arms.[43] He was capable of frequently lifting ten pounds or less and occasionally lifting twenty pounds, but could never lift fifty pounds.[44] He could rarely look up or down ("sustained flexion of neck") and occasionally turn his head right or left or hold it in a static position.[45] He could frequently twist, stoop or bend, and climb stairs, and he could occasionally crouch or squat, but could never climb ladders.[46]

The plaintiff had significant limitations with reaching, handling, and fingering.[47] With his right arm, he could reach (including overhead) for less than four hours in a day. With his left arm and hand, he could reach for fewer than two hours, "grasp, turn, [and] twist objects" for less than one hour, and perform "fine manipulations" for less than one hour.[48] His "impairments [were] likely to produce 'good days' and 'bad days'" and he was "likely to be absent from work [three] or more

---

[38] *Id.*

[39] *Id.*

[40] AR 553.

[41] *Id.*

[42] AR 553–54.

[43] AR 554.

[44] *Id.*

[45] *Id.*

[46] AR 555.

[47] *Id.*

[48] *Id.*

days per month."[49] Dr. Chin said that the plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in this evaluation.[50]

From 2014 to 2017, Dr. Chin evaluated the plaintiff on a regular basis in support of his workers' compensation claim.[51]

## 2.2 Administrative Hearing

The plaintiff appeared before the ALJ on April 25, 2017.[52] He was represented by non-attorney Dr. McCaskell.[53] Also present was VE Harlem Stock.[54]

### 2.2.1 Plaintiff's testimony

The plaintiff testified as follows. He was married and lived with his wife and two children, ages 15 and 18.[55] He went to college and also had vocational training.[56] He was not working and had not worked in any capacity since the date of his injury.[57] When asked how he supported himself financially, he said his wife worked full time and his father had loaned him "quite a bit of money."[58]

Before his injury, he was working as a correctional deputy.[59] His duties included lifting and carrying items "upwards of 100 pounds" and "over 200 pounds at times."[60] After his injury, he

---

[49] Id.

[50] AR 553.

[51] AR 945–1007.

[52] AR 36–72.

[53] Id.

[54] Id.

[55] AR 42.

[56] Id. Other sections of the record indicate that the plaintiff does not have a college degree; he attended college but did not graduate.

[57] AR 43.

[58] Id.

[59] Id.

[60] AR 44.

looked for work in retail, seeking something with fewer physical requirements.[61] No one was willing to hire him due to his limitations.[62]

He had pain in his neck and shoulder, and his left arm was "numb with occasional spikes of pain that go down it."[63] He described himself as "primarily right handed."[64] The numbness was constant since the injury, and he also had a tingling sensation.[65] The pain fluctuated randomly.[66] It was improved by medication and rest, which the plaintiff described as "the only way [he could] get through it."[67] He also had pain and limited mobility in his right arm, "unrelated to this incident," but caused by an earlier injury (around 2002) when he fell off a dump truck.[68] Between the two arms, "the left [was] worse."[69] The plaintiff could use his right arm normally for the most part, except that he could not fully extend it overhead.[70] With the left arm, he was "very limited in what [he could] do."[71] In order to "manipulate anything," it "[had] to be close into [his] body," and he "[had] to physically see what [he was] touching . . . because [he could not] tell how [he was] touching it."[72]

The plaintiff testified about how his symptoms affected his ability to perform self-care and household tasks. He was able to shampoo his own hair.[73] He was able to get dressed on his own, but he "no longer [had] shoes that [he had] to tie," and "buttons [took him] a long time."[74] He

---

[61] *Id.*

[62] AR 45.

[63] *Id.*

[64] *Id.*

[65] AR 46.

[66] *Id.*

[67] *Id.*

[68] AR 47.

[69] *Id.*

[70] AR 47–48.

[71] AR 48.

[72] *Id.*

[73] *Id.*

[74] AR 48–49.

United States District Court
Northern District of California

could start loads of laundry, "but [he did not] carry the baskets of laundry . . . [b]ecause it takes two hands."[75] He was able to wash dishes "if [he could] wash [them] and put [them] in the dishwasher with [his] right hand," but not if the task required both hands.[76] He explained that he had broken "too many dishes" because the numbness in his left arm left him unable to gauge the strength of his grip, stating "I can't tell how heavy I'[m] gripping things. So I drop them or break them or I've squeezed them too tight and I break them."[77] He had also injured himself as a result of the numbness, sometimes burning or cutting himself without realizing it.[78] He testified that he "[did not] cook anymore just because of safety."[79]

On a typical morning, the plaintiff would "[w]ake [his] kids up" and "make sure they [were] getting ready for school," then "try and do whatever dishes [he could]" and "pick up the laundry they [had] left everywhere."[80] He spent the afternoons and evenings "trying to help [his] wife with whatever she need[ed]," such as "get[ting] something out of the cupboard or . . . put[ting] the dishes on the table [to get] ready for dinner."[81]

The plaintiff did not feel safe driving a car because his pain medications caused drowsiness and a "foggy" feeling.[82] He "[tried] not to drive at all unless it [was] absolutely necessary," which amounted to driving "three [to] four times a month" on average.[83] If his children missed the bus and needed a ride to school, and he had already taken his medication, he had to call someone else to drive them.[84]

---

[75] AR 49.

[76] *Id.*

[77] *Id.*

[78] AR 50.

[79] AR 54.

[80] AR 52.

[81] AR 54.

[82] AR 50–51.

[83] AR 50.

[84] AR 52–53.

The plaintiff had an irregular sleep schedule. He "usually end[ed] up falling asleep" during the day due to the side effects of the pain medication.[85] He "[did not] sleep well at night," which he said "[threw] everything off," probably contributing to his daytime tiredness.[86] He slept in a recliner rather than in a bed.[87]

The plaintiff felt that overall his condition was "about the same, maybe a little bit worse" since his injury.[88] He had "a hard time recalling things," which he attributed "mostly" to the medication.[89] His medication "compound[ed] [his] diabetes" because the side effects kept him from being physically active, creating "a vicious little circle."[90] The plaintiff was on insulin for diabetes.[91] He was insulin resistant.[92] His blood sugar levels were consistently above 200 and had gone as high as 600.[93] He was not "affected that badly" even when his blood sugar was dangerously high because his body had "acclimated" to those levels.[94]

In response to his representative's questions, the plaintiff testified as follows. He had been on medication since 2010.[95] These medications made him drowsy and "have these same kinds of limitations."[96] When "manipulating [his] left hand," he kept his "elbow[] close to [his] hip" because he "[could not] fully extend the arm" from the shoulder.[97] He had purchased a

---

[85] AR 53.

[86] AR 55.

[87] *Id.* The plaintiff stated in the 2014 hearing that sleeping position was a focus of his physical therapy sessions. AR 98.

[88] AR 55.

[89] AR 55–56.

[90] AR 56.

[91] AR 57.

[92] *Id.*

[93] AR 57–58.

[94] *Id.*

[95] AR 59.

[96] *Id.*

[97] *Id.*

touchscreen computer because he was able to use it one-handed.[98] He "[had] problems using both hands together."[99] This had been the case since 2010, and he had not had any further injuries to the left shoulder since then.[100] He formerly was a truck driver.[101] He gave up his class A driver's license and now had only a "regular" class C license.[102]

### 2.2.2 Vocational expert's testimony

VE Mr. Stock also testified at the hearing.[103] He characterized the plaintiff's prior jobs as Jailer (DOT code 372.367-014, very heavy as performed, SVP 4), operating engineer (DOT code 859.683-010, heavy as performed, SVP 6), and construction worker (DOT code 869.687-026, heavy as performed, SVP 2).[104]

The ALJ posed the first hypothetical:

> [A]n individual with the [plaintiff]'s age, education[,] and background . . . [who] can perform light work, but should not perform any climbing of ladders, ropes[,] or scaffolding; should not drive or deal with heavy or hazardous machinery or work at unprotected heights for safety reasons. . . . [T]here should be no overhead work. The hypothetical individual can up to frequently reach, handle, [and] finger. . . . And the job should be considered very simple and routine in nature with minimal changes from day to day.[105]

The VE testified that this would rule out all past work.[106] He listed three jobs that such a person could perform: cleaner, housekeeping (DOT code 323.687-014, light, SVP 2), with over 438,450 jobs in the national economy; cashier II (DOT code 211.462-070, light, SVP 2), with over

---

[98] AR 60.

[99] *Id.*

[100] *Id.* The plaintiff stated that he had "fall[en] out of the shower and [broken] a couple of ribs." *Id.* This injury is not cited as part of his disability claims.

[101] *Id.*

[102] AR 60–61.

[103] AR 61.

[104] AR 62–63. The ALJ told the VE not to consider the plaintiff's job as a grocery store cashier from 1990 through 2001 as it was "too old." AR 62.

[105] AR 63.

[106] AR 63–64.

1,256,320 jobs in the national economy; and office helper (DOT 239.567-010, light, SVP 2), with over 82,250 jobs in the national economy.[107]

The ALJ posed a second hypothetical "reducing the reach, handle, finger, feel to occasional," but keeping the other elements the same as the first hypothetical.[108] The VE identified one job that fit this profile: counter clerk (DOT code 249.366-010, light, SVP 2), with 10,880 jobs in the national economy.[109] He also listed two jobs at the sedentary level that otherwise fit the parameters: election clerk (DOT code 205.367-030, sedentary, SVP 2), with 31,980 jobs, and call-out operator (DOT code 237.367-014, sedentary, SVP 2), with 14,630 jobs.[110]

The ALJ posed a third hypothetical:

> [A]n individual who is younger with a high school education, [with the] ability to sit at least six hours in an eight hour day, stand and walk at least six hours in an eight hour day. They can occasionally lift and carry 20 pounds, frequently 10 pounds. The ability to reach overhead is less than four on the right dominant upper extremity, and the ability to reach overhead with the nondominant left hand less than two hours. Otherwise, the dominant right hand does not have any restrictions in terms of hands and fingers. But the left side, the nondominant, is less than an hour for fine manipulation and gross manipulation.[111]

The VE testified that he "would have trouble identifying any jobs" matching those parameters.[112] In response to the ALJ's questions, the VE confirmed that the DOT does not address bilateral dexterity.[113] He testified that in his "experience as a vocational rehabilitation counselor," it would be "very difficult" for an individual with limited use of one arm to start a new job.[114]

---

[107] AR 64.

[108] *Id.*

[109] AR 65.

[110] *Id.*

[111] AR 66.

[112] *Id.*

[113] AR 66–67. This means that the job descriptions cannot fully account for different restrictions on each arm or hand.

[114] AR 67–68. The VE's testimony implied that the exception would be someone already familiar with the work, who might be able to adapt and create workarounds for their own limitation.

### 2.2.3    ALJ findings

The ALJ followed the five-step sequential evaluation process to determine whether the plaintiff was disabled and concluded that he was not.[115]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of April 14, 2008, through his last insured date of December 31, 2010.[116]

At step two, the ALJ found that the plaintiff had five severe impairments: degenerative disc disease of the cervical-spine, degenerative joint disease of the left shoulder, left carpal-tunnel syndrome, obesity, and diabetes mellitus.[117] The ALJ found that these "impairments [were] severe as alleged because they more than minimally affect[ed] the [plaintiff's] ability to perform basic work activities."[118]

The ALJ found that the plaintiff's BMI was consistent with obesity and found the plaintiff's obesity to be severe.[119] The ALJ "considered the functional limitations resulting from the claimant's obesity in the residual functional capacity assessment."[120]

The ALJ considered the "paragraph B" criteria and found that the plaintiff had "mild limitation" in the area of "understanding, remembering and applying information" and no limitations in "social interaction with others," "ability to concentrate, persist or maintain pace," or "ability to adapt and manage oneself."[121] In making this finding, the ALJ noted that the plaintiff was able to perform household tasks, prepare meals, attend family events, take care of his kids, and drive a car.[122]

---

[115] AR 18–20, 30.

[116] AR 20.

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] AR 21.

[122] *Id.*

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[123] The plaintiff did not meet Listing section 1.02 (major dysfunction of a joint) because he did not demonstrate that he was unable to ambulate effectively or unable to perform fine and gross movements effectively with both arms.[124] Specifically, the ALJ held the following:

> A major dysfunction of a joint. . . calls for evidence of a gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints. In addition, there must be evidence of an involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, or involvement of one major peripheral joint in *each* upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively (second emphasis added).[125]

The ALJ found that "[t]he medical evidence of record fail[ed] to provide . . . evidence" of these requirements.[126]

The ALJ then determined the plaintiff's RFC.[127] In making this finding, the ALJ considered all the plaintiff's symptoms and the extent to which they could be reasonably accepted as consistent with the objective medical evidence and other evidence.[128] The ALJ followed a two-step process.[129] First, the ALJ determined that the plaintiff's medically determinable impairments could reasonably cause the alleged symptoms.[130] Second, the ALJ found that the intensity, persistence, and limiting effects of these symptoms, as alleged by the plaintiff, were not consistent with the medical evidence in the

---

[123] *Id.*

[124] AR 22.

[125] *Id.*

[126] *Id.*

[127] AR 23–28.

[128] AR 23.

[129] *Id.*

[130] AR 23, 28.

record.[131] The ALJ concluded that the plaintiff had the RFC to perform light work and "very simple and routine tasks with minimal changes from day-to-day equivalent to unskilled work."[132]

At step four, the ALJ concluded that the plaintiff was unable to perform any past relevant work.[133]

At step five, the ALJ found that the plaintiff had the residual functional capacity to perform light work that did not involve climbing, operating heavy machinery and only occasional reaching.[134]

The ALJ concluded that "there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed," considering his age, education, work experience, and RFC.[135]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

---

[131] AR 23, 28.

[132] AR 23.

[133] AR 28.

[134] AR 23.

[135] AR 29.

# GOVERNING LAW

A claimant is considered disabled if (1) [s]he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows.

**Step One**. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two**. Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. See 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three**. Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four**. Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five**. Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. See 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

The plaintiff stipulated that the ALJ fairly and accurately summarized the medical and non-medical evidence, except in two ways.[136] First, at step five, he contends that the ALJ erred by failing to resolve an apparent conflict between the ALJ's limitation to "very simple and routine" tasks and the duties of a call-out operator or elections clerk.[137] Second, he contends that the ALJ improperly weighed the opinion of Dr. Chin, a treating physician.[138] For the reasons set forth below, the court denies the plaintiff's motion for summary judgment, grants the Commissioner's motion for summary judgment, and affirms the ALJ's order.

### 1. Whether the ALJ Erred at Step Five

The plaintiff contends that the ALJ erred at step five in two ways: (1) the ALJ failed to resolve an apparent conflict between the ALJ's limitation in her hypothetical to "very simple and routine tasks" and the duties of a call-out operator or elections clerk;[139] and (2) the only remaining job (counter clerk) did not exist in a significant number in the national economy.[140]

At step five, the ALJ concluded that the plaintiff had the residual functional capacity to perform light work did not involve climbing, operating heavy machinery and only occasional reaching.[141] She recommended jobs as a counter clerk (DOT 249.366-010; light; svp 2: 10,880 jobs), elections clerk (DOT 205.367-030; sedentary; svp 2; 31,980 jobs) and call-out operator

---

[136] Mot. – ECF No. 18 at 5.

[137] *Id.* at 6.

[138] *Id.* at 12.

[139] *Id.* at 6–7.

[140] *Id.* at 7–11.

[141] AR 23.

(DOT 237.367-014; sedentary; svp 2; 14,630 jobs).[142] The elections clerk and call-out operator jobs require level-three reasoning.

The issue — as the plaintiff puts it — is that level-three reasoning requirement conflicts with the ALJ's finding that the plaintiff can only perform "very simple" work because "it may be difficult for a person limited to simple, repetitive tasks to follow instructions in 'diagrammatic form' as such instructions can be abstract." *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015) (citation omitted).

But this error is harmless. As the government argues, the record does not show any mental impairments or limitations in concentration, persistence, or pace and only mild limitations in understanding, remembering, and applying information.[143]

The plaintiff also argues that the ALJ committed error because there are an insignificant number of counter-clerk positions (10,880 jobs) in the national economy.[144] This argument fails.

Claimants who fail to challenge a testifying VE's job numbers during administrative proceedings forfeit such a challenge on appeal. *Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017). Moreover, an ALJ may rely on a VE's testimony concerning the number of relevant jobs in the national economy, and need not inquire *sua sponte* into the foundation for the expert's opinion. *Id.* at 1110 (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Johnson v. Shalala*, 60 F.3d 1428, 1435–36 (9th Cir. 1995)). The plaintiff did not suggest that the VE's job estimates might be unreliable at any point during administrative proceedings. *Keifer v. Comm'r of Soc. Sec.*, No. 17-cv-00332-EDL, 2018 WL 3398869, at *6 (N.D. Cal. May 1, 2018) ("Because Plaintiff was vigorously represented by Dr. [Dan] McCaskell and failed to challenge the VE's job numbers in any respect, the Court concludes that Plaintiff waived any arguments related to challenging those job numbers . . . ."). His claim is therefore forfeited.

---

[142] AR 29.

[143] Cross-Mot. – ECF No. 19 at 4 (citing AR 21, 29, 37).

[144] Mot. – ECF No. 18 at 10 (citing AR 29).

### 2. Whether the ALJ Erred by Weighing Medical Opinions

The plaintiff contends that the ALJ erred by affording only partial weight to the opinion of his treating physician, Dr. Chin.[145] The court affirms the ALJ's decision because it was supported by substantial evidence.

### 2.1 Legal Standard

"'The ALJ is responsible for resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir, 1995)). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians (and other "acceptable medical sources"): (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if

---

[145] *Id.* at 12.

the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir, 1998) (internal quotation marks and citation omitted); see also *Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (quoting *Embrey v. Bowen,* 849 F.2d 418, 421–22 (9th Cir. 1988)).

"The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citation omitted). An ALJ errs, however, when she "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13 (citation omitted).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician

providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

## 2.2    Application

Dr. Chin's opinion is contradicted by the state-agency consulting physicians' DDEs.[146] Thus, the ALJ was required to give specific and legitimate reasons for discounting Dr. Chin's opinion.

The ALJ gave Dr. Chin's opinion partial weight after discussing the following factors:

> Dr. Chin's finding that the claimant would need an unscheduled 15 minute break and have absences three days per month is not consistent with the claimant's considerable activities of daily living. The claimant is able to care for his children and pets. These neck limitations are inconsistent with the claimant's ability to drive. There is evidence of work activity in the record. The treatment for the claimant's physical impairments has been largely conservative. A surgeon determined that the claimant was not a surgical candidate.
>
> . . .
>
> The undersigned also considered the statements submitted by the claimant's father, Richard Daniels; the claimant's wife, Jamie Daniels; and the claimant's friend, Lori Babcock (15E, 16E, 17E). Ms. Babcock reports that the claimant takes care of kids and two dogs. The claimant prepared meals for the family. The claimant could perform basic cleaning and laundry. The claimant went shopping in stores for household items. He was able to drive a car and go to his children's sporting events (17E). Ms. Daniels stated that the claimant did not sleep through the night due to pain (16E). Mr. Daniels stated that the claimant attended family gatherings. The claimant's pain level kept him home more often (1SE). While the undersigned appreciates these perspectives, the undersigned notes that they are lay opinions based upon casual observation, rather than objective medical examination and testing. However, such lay opinions and observations of a claimant's functioning must be considered (SSR-06-03p). The undersigned notes these statements are not consistent with allegations of disabling impairments and the medical record as a whole, which shows the claimant manages his symptoms with prescribed medication. The evidence of record, taken as a whole, is not consistent with these statements of disabling symptoms. For these reasons, there is no basis on which to afford these opinions more than little weight.
>
> . . .
>
> The allegations are inconsistent with the medical evidence of record and the claimant's activities of daily living. The claimant does sweeping and dishes, drives, mows the lawn on a riding lawn mower, blows leaves and pulls weeds. During the

---

[146] Compare AR 123–134, 135–146 (DDEs) with AR 550–555, 575–602, 945–1007 (Chin).

summer of 2013, the claimant was coaching baseball and gardening (7Fl-2). The claimant took his son fishing (2F91). The claimant cared for his children and two dogs (15E2, 17E2). He could drive a car – he replied that driving for more than one hour aggravated his neck pain (4E2, 17E3, 2F97). He testified that he shared picking up the children with his wife. The claimant shopped in stores ( 4E2, 17E4). He attended his children's sporting events, went to movies, and went to dinners at the homes of friends and family (17E4). He had no reported problems with personal care tasks.

The record reflects some evidence of work after the alleged onset date. On March 7, 2014, the claimant reported that "work was slow." He stated that he was doing odd jobs when he could find them (17F52). In 2011, the claimant stated he was starting a business with his father (3Fl 7).

On April 13, 2016, the claimant's physician noted that the claimant had been gone for approximately five months in Germany the month before (18F33). Although vacations and disability are not necessarily mutually exclusive, the claimant's decision to go on a vacation, especially one requiring international travel, tends to further suggest that the claimant may have greater abilities. [147]

"The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citation omitted). The Ninth Circuit has held that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722.

On this record, the ALJ provided specific and legitimate reasons supported by substantial evidence for giving partial weight to Dr. Chin's opinion.[148]

The ALJ reasonably found that Dr. Chin's opinion was inconsistent with the plaintiff's ability to drive, to complete household chores, and work activity, and an examining surgeon's determination that the plaintiff was not suitable for surgery.[149] *See Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1228 (9th Cir. 2009) (permitting the rejection of a medical opinion that is inconsistent with clinical findings); *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990)

---

[147] AR 27–28.

[148] AR 26–27.

[149] AR 27.

(concluding that claimant's testimony about her daily activities may be seen as inconsistent with the presence of a disabling condition).

The ALJ pointed to inconsistencies between the medical record and the plaintiff's daily activities.[150] The medical evidence showed the plaintiff's daily activities included the following:

- Sweeping;[151]
- Driving for up to forty minutes;[152]
- Mowing the lawn on a riding lawn mower;[153]
- Blowing leaves and pulling weeds;[154]
- Gardening;[155]
- Coaching baseball;[156]
- Caring for his children and two dogs;[157] and
- Shopping.[158]

The record also reflects that the plaintiff was doing odd jobs when he could find them and attempted to start a business with his father.[159] Finally, the ALJ found the plaintiff's five-month trip to Germany suggested that he may have greater abilities.[160]

In sum, the overall record supports the ALJ's decision. *Tackett*, 180 F.3d at 1098. The ALJ's weighing of Dr. Chin's medical opinion was supported by substantial evidence in the record. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[I]f evidence is susceptible of more than one rational interpretation, the decision of the ALJ must be upheld.") (citation omitted).

---

[150] AR 28.

[151] AR 127.

[152] AR 329.

[153] AR 126.

[154] *Id.*

[155] AR 557.

[156] AR 556.

[157] AR 367.

[158] AR 369.

[159] AR 552, 776.

[160] AR 977.

**CONCLUSION**

The court denies the plaintiff's motion for summary judgment and grants the Commissioner's

cross-motion for summary judgment.

This disposes of ECF Nos. 18 & 19.

**IT IS SO ORDERED.**

Dated: March 23, 2020

_____

LAUREL BEELER
United States Magistrate Judge